-------------------------------------------------x

UNION COSMETIC CASTLE, INC.,
SOOKHUI KIM d/b/a MONET ASSI
PLAZA, EVERGREEN COSMETICS, INC.,
HI CHO SUH d/b/a BROADWAY AMORE
COSMETICS and CHUN HA MUN d/b/a
BYC APPAREL,

        Plaintiffs,

      -against-

AMOREPACIFIC COSMETICS USA, INC.,
AMOREPACIFIC, INC., JEE YOUNG JIN
d/b/a JEE YOUNG JIN COSMETICS, JEE
YOUNG JIN d/b/a THE AMORE and
YULIA MIN d/b/a SEOUL PLAZA
MONET,

        Defendants.

-------------------------------------------------x

MEMORANDUM AND ORDER
06 - CV - 3931

GLASSER, United States Senior District Judge

## **INTRODUCTION**

      Plaintiffs in this civil action alleging violations of federal and state antitrust law and several common law causes of action move this court for a preliminary injunction and temporary restraining order 1) requiring defendants Amorepacific Cosmetics USA, Inc. and Amorepacific, Inc. (collectively, the "Amore Defendants") to resume supplying plaintiffs with Amorepacific brand cosmetics at the prevailing market rate during the pendency of this action; 2) restraining defendants Jee Young Jin d/b/a Jee Young Jin Cosmetics, Jee Young Jin d/b/a The Amore, and Yulia Min d/b/a Seoul Plaza Monet

1

(collectively, the "Retail Defendants") from encouraging, requesting or inducing the Amore Defendants to refuse to supply Amorepacific brand cosmetics to the plaintiffs; 3) awarding the plaintiffs recovery of their costs and disbursements, including reasonably attorneys' fees, incurred in connection with this motion, and 4) awarding such other and further relief as the court deems just and proper. For the reasons stated below, the plaintiffs' motion is denied in its entirety.

## FACTS

Plaintiffs Union Cosmetic Castle, Inc., Sookhui Kim d/b/a Monet Assi Plaza, Evergreen Cosmetics, Inc., Hi Cho Suh d/b/a Broadway Amore Cosmetics, and Chun Ha Mun d/b/a BYC Apparel are corporations or sole proprietorships engaged in the retail distribution of Korean cosmetics in Queens, New York. The Amore Defendants are regional distributors of the Amorepacific cosmetic line manufactured by non-party Amorepacific Corporation, the largest cosmetics manufacturer in the Republic of Korea. The Retail Defendants are retailers of Korean cosmetics and compete with the plaintiffs in the Korean cosmetics market in Queens, New York.[1]

The gravamen of the plaintiffs' complaint is that the Amore Defendants violated several provisions of the federal and state antitrust laws, New York state law regarding deceptive trade practices, and several common law duties by unilaterally adopting an exclusive distributorship business model and refusing to sell Amorepacific products to

---

[1] In their memorandum of law in opposition to the instant motion, the defendants argue that the plaintiffs fail to adequately identify the relevant market, with respect to both product interchangeability and geographic boundaries. Although further evidence must be submitted on these issues before the court is prepared to make a final determination of the relevant market, it is satisfied at this stage of the proceedings by the plaintiffs' representations that the market for Korean-manufactured cosmetic products among the large population of Koreans and Korean-Americans located in the several neighborhoods of Queens in which the plaintiffs and Retail Defendants compete constitutes a discrete relevant market.

former retailers, such as the plaintiffs, who refused to accept the exclusive dealing arrangement proposed by the Amore Defendants, which would preclude them from carrying Korean cosmetic products manufactured or distributed by the Amore Defendants' competitors.[2] The complaint further alleges that, by accepting the Amore Defendants' offer to enter into such exclusive distribution agreements, the Retail defendants breached the federal and state antitrust laws by conspiring with the Amore Defendants to exclude the plaintiffs from the New York City Korean cosmetics market.[3]

Plaintiffs operate stores and boutiques in predominantly Korean-American communities in Queens, and are former retail vendors of the Amorepacific line of cosmetics distributed in New York City by the Amore Defendants. The plaintiffs allege that, from at least August 2004 until March 2006,[4] Amorepacific products were the dominant cosmetic products sold in each plaintiff's store, and comprised more than 50%

---

[2] Specifically, the plaintiffs' complaint alleges causes of action against the Amore Defendants for three independent violations of section 1 of the Sherman Act, 15 U.S.C § 1 (unlawful contracts, combinations and conspiracy in restraint of interstate trade and commerce, refusal to deal with plaintiffs, and participating in a group boycott of the plaintiffs); two violations of section 2 of the Sherman Act, 15 U.S.C. § 2 (monopolization and attempted monopolization of the Korean cosmetic market in New York City), one violation of the Clayton Act, 15 U.S.C. § 14 (illegal tying); two violations of New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340 et seq. (price fixing and refusal to do business in restraint of trade); violation of N.Y. Gen. Bus. Law § 349 (deceptive trade practices); promissory estoppel; tortious interference with business relations; and breach of the implied covenant of good faith and fair dealing.

[3] Plaintiffs allege all of the claims in the complaint against the Retail defendants except breach of N.Y. Bus. Law § 349, promissory estoppel, and breach of the implied duty of good faith and fair dealing.

[4] The parties' submissions are not entirely clear as to how long the business relationships between the plaintiffs and the Amore Defendants lasted prior to their termination by the Amore Defendants in March 2006. The complaint refers to an August 2004 meeting in which the Amore Defendants first announced their intention to move to an exclusive distribution system, see Compl. ¶ 50, and the memorandum of law in support of plaintiffs' motion for temporary and preliminary injunctive relief refers to the distribution relationship as "years-long." Memorandum in Support of Plaintiffs' Motion for Temporary and Preliminary Injunctive Relief ("Pl. Br.") at 8. The court thereby infers that the plaintiffs maintained amicable business relations with the Amore Defendants for at least approximately one and one half, and possibly several, years.

of each plaintiff's annual gross sales in 2005. Although the parties' business relationships were never reduced to a written or oral contract, the plaintiffs allege that shortly after the inception of their at-will relationships, the Amore Defendants introduced certain promotional initiatives, including free samples of Amore products, rebates on wholesale purchases, and monetary awards, which were intended to motivate the plaintiffs to purchase and carry more Amorepacific cosmetics than they otherwise would have. These marketing tactics, to which the plaintiffs "acquiesced," in conjunction with the unique qualities of Amorepacific brand cosmetics, enabled the Amore Defendants to deeply penetrate the Korean cosmetics market in New York, such that Amorepacific became the dominant brand in that market. The plaintiffs allege that, notwithstanding the lack of a formal contract between the parties, the Amore Defendants exercised greater control over the business decisions of their retailers than is generally the case, by, for example, dictating rather than suggesting the retail price at which the retailers could sell Amorepacific products, and further allege that each plaintiff complied with all demands and conditions made by the Amore Defendants during the period of their commercial relationship.

The parties' relationship began to deteriorate in August 2004, when the Amore Defendants held a meeting with the plaintiffs and other retailers in which they first announced their intention to enter into exclusive dealing agreements with Amorepacific retailers. Nearly a year later, in June 2005, a second meeting was held, in which the plaintiffs allege that the Amore Defendants demanded that the plaintiffs cease carrying cosmetics from other manufacturers and enter into exclusive distributorship agreements. The plaintiffs refused to comply with the Amore Defendants' request, and

in January 2006, the Amore Defendants notified the plaintiffs of their intention to discontinue sales of Amorepacific products to retailers who had not agreed to operate their establishments as "Amore Exclusive Shops."[5] Finally, in March 2006, the Amore Defendants notified each plaintiff by letter of their intention to terminate the distribution and sale of Amorepacific cosmetic products to the plaintiffs, because of the plaintiffs' rejection of the Amore Defendants' invitation to participate in the exclusive distribution arrangement. On or about March 31, 2006, the Amore Defendants did terminate the distribution and sale of Amorepacific products to each plaintiff, and have thereafter refused to sell Amorepacific products to any plaintiff. The Retail defendants, who are competitors with the plaintiffs in the Korean cosmetics retail market in New York City, entered into exclusive distribution agreements with the Amore Defendants, and continue to receive supplies of Amorepacific cosmetics from the Amore Defendants in accordance with those agreements. The plaintiffs allege that, largely due to the demand created by their own earlier efforts on behalf of the Amore Defendants, Amorepacific cosmetics are now the predominant cosmetic products in the New York City Korean cosmetics market, and that the plaintiffs' sales have declined significantly

---

[5] A disputed issue of fact exists between the plaintiffs and defendants as to when the plaintiffs were first made aware of the Amore Defendants' intention to supply Amorepacific products solely to exclusive distributors. Throughout their memorandum of law in opposition to the plaintiffs' motion, the defendants argue that the plaintiffs were made aware of this intention at the August 2004 meeting. The plaintiffs, however, contend that they were given no notice of the Amore Defendants' intention to terminate their supply of Amorepacific products until March 2006.

The plaintiffs' protests notwithstanding, a letter dated January 19, 2006, from the Amore Defendants to the plaintiffs, submitted to the court by the plaintiffs in support of the instant motion, unambiguously states that "Amore is cleaning the existing stores and at the end, the supply of Amore products will be limited to 'Amore exclusive store.'" Affidavit of Naomi Kwon, Ex. A. ("Kwon Aff.") (emphasis added). The court therefore concludes that the plaintiffs were made aware, at the latest, in January 2006 of the Amore Defendants' intention to terminate the supply of Amorepacific products to all retailers who did not accept their offer to enter into an exclusive dealing relationship.

since their supply of Amorepacific products was terminated by the Amore Defendants. The plaintiffs further allege that this reduction in sales and the loss of their customer base and goodwill put their businesses in serious jeopardy of financial insolvency in the near future.

The plaintiffs commenced this action in August 2006, alleging various violations of federal and state law against the defendants.[6] Currently before the court is the plaintiffs' motion for a temporary restraining order and preliminary injunction ordering, inter alia, the Amore Defendants to resume supplying the plaintiffs with Amorepacific products at the current market price during the pendency of the underlying action. The defendants oppose the plaintiffs' motion on the grounds that the plaintiffs have failed to establish either irreparable harm or a likelihood of success on the merits of their various claims.

## DISCUSSION

### A.   Standard for Injunctive Relief

Federal Rule of Civil Procedure 65 permits this court to grant such provisional remedies as preliminary injunctions and temporary restraining orders in appropriate circumstances. However, "[a] preliminary injunction is considered an 'extraordinary' remedy that should not be granted as a routine matter." Ahmad v. Long Island Univ., 18 F. Supp. 2d 245, 247 (E.D.N.Y. 1998) (citing JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990) (recognizing that the preliminary injunction is "one of the

---

[6] See supra notes 2 and 3. The plaintiffs do not rely on their claims for deceptive trade practices in violation of N.Y. Bus. Law § 349 or tortious interference with business relations as bases for the instant motion.

most drastic tools in the arsenal of judicial remedies")). In order to establish the propriety of such drastic judicial intervention, the general rule is that the moving party must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 192 (2d Cir. 2004) (quoting Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 96 (2d Cir.2002)). This is a heavy burden of persuasion, and it becomes even heavier when the moving party seeks mandatory relief, rather than prohibtory maintenance of the status quo, by means of a provisional remedy. "The party seeking the injunction must show a 'clear' or 'substantial' likelihood of success where the injunction sought is mandatory-i.e., it will alter, rather than maintain, the status quo." Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (citing Tom Doherty Assoc., Inc. v. Saban Entm't Co., 60 F.3d 27, 34 (2d Cir. 1995)).

The plaintiffs argue that the provisional relief they seek would be prohibitory, and therefore not subject to the higher standard applied to requests for mandatory injunctions, because it would merely maintain the status quo by restoring the relationship between the plaintiffs and defendants to the state in which it existed before the defendants' allegedly anticompetitive policies were enacted. The plaintiffs' apparent interpretation of the term "status quo" lacks a basis in law or common sense. The Second Circuit has clearly articulated the distinction between prohibitory and mandatory injunctions, noting that "[a] prohibitory injunction is one that forbids or restrains an act.... A mandatory injunction, in contrast, orders an affirmative act or

7

mandates a specified course of conduct." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (citations omitted). Moreover, Black's Law Dictionary defines the term "status quo" simply as "[t]he situation that currently exists." Bryan A. Garner, Black's Law Dictionary 1448 (8th ed. 2004). Because the relief sought by the plaintiffs' motion for a preliminary injunction and temporary restraining order would alter the relationship between the parties as it currently exists by compelling the defendants to undertake an affirmative course of conduct, namely the reinstatement of business relations with the plaintiffs, the plaintiffs must justify their request for these provisional remedies by demonstrating a substantial likelihood of success on the merits of their claims.

## B.    **Irreparable Harm**

The plaintiffs argue that if the requested provisional remedies are not granted, "(i) Plaintiffs' customer base will continue to erode… (ii) more of their longtime customers will begin to patronize the Retail Defendants' Amore Exclusive Shops… and (iii) Plaintiffs will likely be forced to close their stores in the near future." Pl. Br. at 11. The threat of imminent financial ruin, if legitimate, might reasonably be found to constitute prima facie evidence of irreparable harm. See, e.g., Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989) (irreparable harm prong satisfied where there is "ample evidence of plaintiffs' imminent bankruptcy."). However, as the defendants point out, a plaintiff's undue delay in seeking injunctive protection can preclude, as a matter of law, the finding that the plaintiff will suffer irreparable harm if the provisional remedy is not granted. The defendants cite Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985), in which the Second Circuit reversed the district

court's grant of a preliminary injunction where the movant "waited more than ten weeks after it learned directly of Citytrust's plans, and more than nine months after it received notice through the press" of those plans. The Citibank court, addressing a preliminary injunction granted in a trademark infringement matter, noted that significant delay "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial," and recognized that although a period of delay might be insufficient to preclude a permanent injunction granted after trial, "it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." Id. The Second Circuit's reasoning in Nassau Boulevard Shell Serv. Station v. Shell Oil Co., 869 F.2d 23 (2d Cir. 1989) (per curiam), is also relevant here. In that case, the Second Circuit granted an emergency motion for a preliminary injunction enjoining the defendant franchisor from terminating the plaintiff's franchise during the pendency of the litigation, which had initially been denied by this court on the ground that the plaintiff, having been aware of the defendant's intention to terminate the plaintiff's franchise for months, waited until the last moment to move for the requested injunction. The Second Circuit recognized that "in the future preliminary relief should ordinarily not be granted in franchise disputes where the franchisee, having knowledge for weeks or months of the franchisor's intention to terminate, waits until the very eve of termination to seek such relief," and that the business losses flowing from the defendant's termination of the plaintiff's franchise "[do] not call for preliminary relief pending the adjudication of legal issues when those losses are the result of the movant's delay in seeking relief," but granted the plaintiff's motion solely on the basis that "[the plaintiff's] counsel merely followed a practice prevalent among lawyers who represent

9

franchisees," and that it would "be inequitable to subject [the plaintiff] to a new rule concerning the exercise of our equitable power." Id. at 23-24. The court further cautioned that "[i]n the future, however, franchisees seeking preliminary relief in disputes with their franchisors should move for such relief within a reasonable time after notice of termination of their franchise agreements.... If they do not do so, they should be prepared to suffer the loss of their business while they litigate the merits." Id. at 24. Although no franchise agreement existed between the plaintiffs and the Amore Defendants, the principle behind the Second Circuit's admonitions in Nassau Boulevard Shell Serv. Station– that a plaintiff given notice of a defendant's intention to terminate the supply of goods that constitute the plaintiff's livelihood should not be permitted to wait until its own financial ruin is imminent before seeking an expedited provisional remedy– applies with equal force to the instant proceeding. As the Second Circuit noted, "[t]his is a delaying tactic that is inequitable to the franchisor and to the courts as well." Id. at 24.

In this case, the plaintiffs were aware, at the latest,[7] in January 2006 of the Amore Defendants' intention to restrict the sale of Amorepacific cosmetic products to their exclusive distributors. The plaintiffs' delay of approximately seven months[8] in

---

[7] As discussed above, see supra note 5, the defendants argue that the plaintiffs were aware since August 2004 of the Amore Defendants' intentions to convert their business to an exclusive distributorship model. Although the defendants' contention on this issue might be substantiated by the submission of further evidence, for purposes of this motion the court will grant the plaintiffs the benefit of the most favorable reading of their complaint, which alleges their discovery of the defendants' plan in January 2006. See Compl. ¶ 52 ("As of January 2006... the Amore Defendants informed Plaintiffs that the Amore Defendants would discontinue all sales incentives for Plaintiffs' stores and boutiques and that in the future they would sell Amore products only to retailers who agreed to operate their establishments solely as 'Amore Exclusive Shops.'"); see also Kwon Aff. Ex. A.

[8] This action was commenced on August 15, 2006.

commencing this action negates the alleged urgency of the plaintiffs' financial conditions in the absence of fresh supplies of Amorepacific cosmetics, particularly in light of the fact that the Amore Defendants actually terminated the plaintiffs' access to its products in March 2006, five months before the instant action was commenced. The plaintiffs are therefore, as a matter of law, unable to demonstrate the irreparable harm necessary to sustain a motion for provisional remedies pursuant to Fed. R. Civ. P. 65. As discussed below, the plaintiffs have also failed to establish a substantial likelihood of success on the merits of any of their claims against the defendants.

## C.    Likelihood of Success on the Merits

Despite the plethora of federal and state law claims that the plaintiffs bring against the defendants, they fail to establish a substantial likelihood of success on the merits as to any issue.

### 1.    Plaintiffs Lack Standing to Pursue Their Antitrust Claims

#### a.    Article III Standing

Article III of the United States Constitution, which authorizes the federal courts to hear, inter alia, "cases" or "controversies" arising under the laws of the United States, requires every plaintiff to establish standing to bring the action before the court. The Supreme Court has identified three elements that all plaintiffs seeking to establish standing must demonstrate:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, see [Allen v. Wright, 468 U.S. 737, 756 (1984)], and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" [Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)] (quoting Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)). Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly... trace[able] to the challenged

action of the defendant, and not... th[e] result [of] the independent action of some third party not before the court." <u>Simon v. Eastern Ky. Welfare Rights Organization</u>, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." <u>Id.</u>, at 38, 43, 96 S.Ct., at 1924, 1926.

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-561 (1992) (citations and footnote omitted); <u>see also</u> <u>Jaghory v. New York State Dept. of Educ.</u>, 131 F.3d 326, 328 (2d Cir. 1997).

The court is driven to conclude that the plaintiffs cannot establish Article III standing to pursue their antitrust claims against the defendants. There is no doubt that the substantial reduction in business that the plaintiffs are alleged to have suffered following the Amore Defendants' termination of the plaintiffs' supply of Amorepacific cosmetics constitutes a concrete and actual injury in fact, and the allegations in the complaint and affidavits submitted by the plaintiffs plausibly suggest that this injury would likely be remedied by a favorable decision against the defendants here. Nevertheless, the plaintiffs' own allegations establish that the injury of which they complain is primarily self-inflicted, the result of the plaintiffs' poor business judgment in rejecting the Amore Defendants' offer of an exclusive dealing arrangement with each of the plaintiffs. A plaintiff cannot establish Article III standing to pursue a cause of action where that plaintiff is the primary cause of its own alleged injury. <u>See</u> <u>Taylor v. Fed. Deposit Ins. Co.</u>, 132 F.3d 753 (D.C. Cir. 1997) (holding that plaintiffs lacked standing on action for reinstatement against former employer where plaintiffs voluntarily terminated their own employment); <u>St. Pierre v. Dyer</u>, 208 F.3d 394 (2d Cir. 2000). In undertaking this analysis, the court is cognizant of the Second Circuit's

admonition in <u>St. Pierre</u> that "[n]ot every infirmity in the causal chain deprives a plaintiff of standing," <u>id.</u> at 402, and that "[s]tanding is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain." <u>Id.</u> (quoting 13 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, <u>Federal Practice and Procedure</u> § 3531.5 (2d ed.1984)). However, the situation presented by the instant case is closely analogous to that in <u>Taylor</u>, in which the D. C. Circuit held that the plaintiffs' voluntary act of terminating their employment with the defendant undermined the element of causation in the court's analysis of the plaintiffs' standing to seek reinstatement. The <u>Taylor</u> court noted that "[t]he plaintiffs' voluntary departure creates a large hole in their cause of action: In requesting reinstatement, they seek a remedy for injury that is in large part self-inflicted," and held that "[f]ailing to show causation, [the plaintiffs] lack standing" to seek reinstatement. 132 F.3d at 767. Likewise, here, the injury of which the plaintiffs complain appears to be largely the result of their own business decisions. The plaintiffs' allegations clearly indicate that they were given several opportunities, beginning in 2004, to enter into the exclusive dealing agreements proposed by the Amore Defendants. Their free choice to reject the Amore Defendants' offer, presumably made under the belief that doing so would best protect the plaintiffs' business interests, acts as an intervening cause of the plaintiffs' present commercial woes. Article III of the federal Constitution does not grant the plaintiffs access to the federal courts in order to second-guess their poor business judgment.

**b.    <u>Antitrust Standing</u>**

Even if the plaintiffs are able to meet the basic criteria required by Article III to

13

establish standing, the antitrust laws impose additional standing requirements beyond those applied to all plaintiffs by Article III. The Second Circuit has recognized that "[i]t is now well settled that in order to have standing to prosecute private antitrust claims... '[p]laintiffs must prove an <u>antitrust</u> injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" <u>Daniel v. Am. Bd. of Emergency Medicine</u>, 428 F.3d 408, 438 (2d Cir. 2005) (quoting <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977)) (emphasis in original); <u>see also</u> <u>Bakalaw v. Lovell</u>, 14 F.3d 793, 797 (2d Cir. 1994) (same). In order to prove an antitrust injury, "[p]laintiffs must allege harm to the general market that has, in turn, harmed their own interests." <u>E&L Consulting, Ltd. v. Doman Indus., Ltd.</u>, 360 F. Supp. 2d 465, 474 (E.D.N.Y. 2005) (holding that alleged exclusive distributorship arrangement did not constitute antitrust injury).

The exclusive dealing arrangements described in the plaintiffs' complaint are not the sort usually held to harm the general market, because the exclusivity arrangement between the Amore Defendants and the Retail defendants is, at most, a "presumptively legal" restraint on intrabrand competition. <u>Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.</u>, 129 F.3d 240, 245 (2d Cir. 1997) (affirming dismissal of antitrust action where the "allegations in ECC's complaint establish nothing more than a run-of-the-mill exclusive distributorship controversy, where a former exclusive distributor is attempting to protect its competitive position vis a vis its supplier."). The plaintiffs have alleged nothing to overcome the presumption of legality to which the exclusive distributorship arrangement is entitled under the law. "For an exclusive dealership arrangement to cause a harm to competition (and overcome the

presumption of legality), it must prevent competitors from getting their products to consumers at all." United States v. Visa U.S.A., Inc., 344 F.3d 229, 242 (2d Cir. 2003) (citing CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 80 (2d Cir. 1999)). In CDC Techs., the Second Circuit further stated that "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements with distributors] foreclose competition from any part of the relevant market." CDC Techs., 186 F.3d at 80 (quoting Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997), cert. denied, 525 U.S. 812 (1998)) (emphasis and bracketed portion in CDC Techs). Although CDC Techs. addressed an exclusive dealing arrangement between a manufacturer and its distributors, its logic applies with equal force to the next level in the distribution chain: the commercial relationships between wholesale distributors such as the Amore Defendants, and retail outlets such as the plaintiffs and the Retail Defendants. So long as the exclusive dealing arrangement between the Amore Defendants and the Retail Defendants does not prevent competing brands' access to the market in whatever quantities customers demand, it is unclear that the relationship imposes any negative restriction on competition in the market whatsoever. Ironically, the plaintiffs themselves, all of whom allegedly serve as retail outlets for competing brands of Korean cosmetics, are the very "existing channels of distribution" whose existence precludes the finding that the defendants' actions threaten to foreclose competition in the New York City market for Korean cosmetics.

In response to this observation, the plaintiffs argue that, because of the Amorepacific brand's dominant position in the relevant market, retail outlets denied

access to the Amore Defendants' line of cosmetics cannot sustain themselves in competition with retailers that continue to offer Amorepacific products, and risk being driven out of business entirely due to their substantial competitive disadvantage. The plaintiffs' argument, thus formulated, fails to allege an antitrust injury. The plaintiffs' position appears to suggest that the Amore Defendants bear a legal obligation under the antitrust laws to subsidize the market for their competitors' products. As the plaintiffs have conceded, the Amorepacific brand dominates the Korean cosmetics market largely because Amorepacific products are demonstrably superior to those manufactured by Amorepacific Corporation's competitors. For example, the plaintiffs' complaint makes note of the "holistic approach" and "use of natural ingredients" employed by Amore Corporation in the manufacture of its cosmetics, and alleges that "[e]xclusivity of ingredients and secret manufacturing techniques are responsible, in part, for the Amore Defendants' market stronghold." Compl. ¶¶ 37-38. The plaintiffs' argument implies that the Amore Defendants are legally obliged under the antitrust laws to moderate these competitive advantages by refraining from participation in exclusive dealing arrangements, thereby enabling competing brands to exploit the commercial success of Amorepacific cosmetics for their own benefit by marketing their products through retail outlets sustained primarily by the sale of the Amore Defendants' cosmetic products.

The court finds no basis in law for the suggestion proffered by the plaintiffs that a business entity must take affirmative steps to protect its competitors from the effects of open competition in the marketplace. To the contrary, "antitrust laws were enacted for 'the protection of competition, not competitors.'" R. C. Bigelow v. Unilever N.V., 867 F.2d 102, 110 (2d Cir. 1989) (quoting Brown Shoe Co. v. United States, 370 U.S. 294,

320 (1962)) (emphasis in original). The possibility raised by the plaintiffs, that retail outlets offering less competitive brands may be forced out of the market because there is insufficient demand for those products by consumers in the relevant market, is simply not an "injury of the type the antitrust laws were intended to prevent." <u>Daniel</u>, 428 F.3d at 438. A competitor that finds itself on the losing end of competition in the free market cannot seek refuge under the antitrust laws simply on the ground that its products lack sufficient public demand to ensure the continuing economic feasibility of that competitor's ongoing business. As the complaint fails to allege that the exclusive dealing arrangements between the Amore Defendants and each individual Retail Defendant creates an injury to competition in the New York City Korean cosmetics market, rather than simply to certain individual competitors, the plaintiffs have failed to plead an antitrust injury of the sort necessary to establish standing to pursue any of their claims arising under the antitrust laws. Accordingly, the plaintiffs have failed to establish a substantial likelihood of success on the merits of those claims.

## 2. **Plaintiffs Cannot Succeed on Their Promissory Estoppel Claim**

The plaintiffs have likewise failed to establish a substantial likelihood of success on the merits of their claim for promissory estoppel against the Amore Defendants. In order to state a claim for promissory estoppel, the plaintiffs must allege "(1) an oral promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance." <u>New York City Health & Hosps. Corp. v. St. Barnabas Hosp.</u>, 10 A.D.3d 489, 491 (1st Dep't 2004). The plaintiffs concede that the Amore Defendants made no "clear and unambiguous" promise of a continuing commercial relationship, but suggest that they need not allege such a

promise in order to state a valid claim for promissory estoppel because "[s]uch promises can be made orally or through a party's conduct." Pl. Br. at 31. The plaintiffs contend that the Amore Defendants' policy of offering sales incentives such as discounts and free merchandise in return for large orders "connoted the expectation of longevity." Id. at 31-32.

Putting aside the implausibility of the plaintiffs' suggestion that the promise of a long-term commercial relationship could reasonably be derived from the practice of offering sales incentives to retail outlets, the authorities cited by the plaintiffs in support of their assertion that an enforceable promise may be implied by the parties' ongoing conduct are entirely unpersuasive, primarily because they both address the doctrine of implied contract rather than promissory estoppel. See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 581-582 (analyzing New York law of implied contract); Wanaque Borough Sewage Auth. v. Township of West Milford, 677 A.2d 747, 752 (N.J. 1996) (citing Restatement (Second) of Contracts § 4 (1979) for the proposition that "[c]ontracts implied in fact are no different than express contracts.... Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances."). The plaintiffs' tacit conflation of the two theories notwithstanding, a claim of promissory estoppel is not a claim for the breach of an implied contract. The Second Circuit has recognized that "implied contract and promissory estoppel have distinct requirements," so that "a claim for breach of implied contract is distinct from a promissory estoppel claim." Cweklinski v. Mobile Chemical Co., 364 F.3d 68, 77-78 (2d Cir. 2004) (applying Connecticut law). The same holds true under New York law:

18

> While a claim for an implied contract in fact and one for promissory estoppel are both grounded in equitable principles, a plaintiff must establish different elements to be successful. For example, a claim for an implied contract requires that plaintiff prove that there were inferences to be drawn from the conduct of the parties that they intended to be bound by a contract. <u>Ellis v. Provident Life & Accident Ins. Co.</u>, 3 F. Supp. 2d 399 (S.D.N.Y.1998). On the other hand, <u>a promissory estoppel claim requires plaintiff to prove a promise clear and unambiguous in its terms;</u> reliance by the party to whom the promise is made; that such reliance to be both reasonable and foreseeable; and that the party asserting the estoppel was injured by his reliance. <u>Sanyo Electric, Inc. v. Pinros & Gar Corp.</u>, 174 A.D.2d 452, 571 N.Y.S.2d 237 (1st Dep't 1991).

<u>Missigman v. USI Northeast, Inc.</u>, 131 F. Supp. 2d 495, 518 (S.D.N.Y. 2001) (emphasis added). Having failed to allege any clear and unambiguous promise by the Amore Defendants to continue supplying the plaintiffs with Amorepacific products indefinitely, the plaintiffs have failed to state a valid claim for promissory estoppel.

### 3. **Plaintiffs Cannot Succeed on Their Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

The plaintiffs also claim that the Amore Defendants breached the implied covenant of good faith and fair dealing by inducing plaintiffs to undertake a greater volume of business with them than the plaintiffs otherwise would have through the aforementioned sales incentives, by implicitly assuring them of the ongoing nature of the parties' business relationship, and by "terminating this relationship without adequate notice." Pl. Br. at 34. The plaintiffs' claim is patently frivolous. The plaintiffs have conceded, both in their brief and at oral argument, that other than individual purchase orders, no contract existed between the plaintiffs and the Amore Defendants at any time. <u>See</u> <u>id.</u> at 32 ("Plaintiffs' proven sales success was generated from the distributional relationship operating for over two years <u>in the absence of detailed</u>

written contracts."), 34 ("there was <u>no tangible contract</u> explicitly forbidding the Amore Defendants from discontinuing the supply of their cosmetics to the Plaintiffs....") (emphasis added). It is elementary that "no covenant of good faith and fair dealing arises in the absence of a contract." <u>County of Washington v. Counties of Warren and Washington Indus. Dev. Agency</u>, 2 Fed. Appx. 71 (2d Cir. 2001). Far from recognizing a substantial likelihood of success on the merits of this claim, the court can conceive of no set of facts consistent with the plaintiffs' allegations in which the Amore Defendants might have even been subject to an implied covenant of good faith and fair dealing as to the plaintiffs, much less have breached one.

## CONCLUSION

For the reasons stated above, the plaintiffs' motion for a temporary restraining order and preliminary injunction is hereby DENIED in its entirety.

SO ORDERED.

Dated:      Brooklyn, New York
             October 4, 2006

_____/s/_____

I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for the Plaintiffs</u>

Christine M. Bae
Kim & Bae, P.C.
400 Madison Avenue
11th Floor
New York, NY 10017

<u>Counsel for the Defendants</u>

Mark Allen Robertson,
Fulbright & Jaworski LLP
666 Fifth Avenue
New York, NY 10103